```
 1                    UNITED STATES BANKRUPTCY COURT
                      WESTERN DISTRICT OF WASHINGTON
 2

 3  MELANIE A. SMITH,              : Case No.: 24-10218-CMA
                                   :
 4                                 : Seattle, WA
                                   : April 10, 2025
 5          DEBTOR.                : 11:16 a.m.
    -------------------------------x
 6                      TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE CHRISTOPHER M. ALSTON,
 7                 UNITED STATES BANKRUPTCY JUDGE
    APPEARANCES:
 8

 9  For the Debtor:          WILLIAM C. BUDIGAN, ESQ.
                             BUDIGAN LAW FIRM
10                           2601 42nd Ave. W.
                             Seattle, WA  98199

11  For the Trustee:         RORY C. LIVESEY, ESQ.
                             THE LIVESEY LAW FIRM
12                           2033 Sixth Avenue
                             Suite 900
13                           Seattle, WA  98121

14  For Deutsche Bank:       DAVID PETTEYS, ESQ.
                             ALDRIDFE PITE, LLP
15                           9311 SE 36th Street, Suite 207
                             Mercer Island, WA 98040
16

17  For Selene Financing:    LANCE OLSEN, ESQ.
                             McCarthy Holthus
18                           108 1st Ave S Ste 300,
                             Seattle, WA 98104-2104
19
    For Stephen Fry:         CAMBRIA QUEEN, ESQ.
20                           DICKSON, FROHLIUCH PHILLIS BURGESS
                             1420 5th Ave, Suite 2000
21                           Seattle, WA 98101

22  Transcription Service:   Burke Court Reporting, LLC
                             1044 Route 23 North, Suite 206
23                           Wayne, NJ 07470
                             (973) 692-0660
24
    Proceedings recorded by electronic sound recording;
25  Transcript produced by transcription service.
```

1                               INDEX

2                                                         PAGE

3    Court's Ruling                                      44

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(11:16 a.m.)

1

2

3          THE COURT:  All right.  That takes us to the Melanie

4   Smith matter.  I imagine this will not go as quickly as the

5   last one.

6          All right.  Yeah, just find a chair.  All right.

7          Good morning, everyone.  We are here in the Melanie

8   Smith matter.  I will take appearances in a moment, but what

9   brings us here today is the Chapter 7 Trustee's motion to

10  either sell the property free and clear or to abandon the

11  property.  So why don't we start with Mr. Livesey and we'll do

12  appearances and go around the room.

13         MR. LIVESEY:  Good morning, Your Honor, Rory Livesey

14  here for the Chapter 7 Trustee Michael Klein.

15         THE COURT:  Good morning, Mr. Livesey.

16         Mr. Petteys, you're next.

17         MR. PETTEYS:  Thank you, Your Honor, David Petteys on

18  behalf of Deutsche Bank, National Trust Company.

19         THE COURT:  Good morning, Mr. Petteys.

20         MR. PETTEYS:  Good morning.

21         MR. OLSEN:  Good morning, Your Honor, Lance Olsen on

22  behalf of Selene Finance, servicer for the Trust.

23         THE COURT:  Good morning, Mr. Olsen.

24         MR. BUDIGAN:  Good morning, Your Honor, William

25  Budigan for the debtor who's here, Maryland Sellers -- Melanie

1  --

2       THE COURT:  Melanie Smith.

3       MR. BUDIGAN:  Melanie Smith, I'm sorry.

4       THE COURT:  That's all.  Good morning, Mr. Budigan,

5  and welcome back, Ms. Smith.

6       MS. QUEEN:  Good morning, Your Honor, Cambria Queen

7  representing interested party Mr. Stephen Fry.

8       THE COURT:  All right.  Good morning, Ms. Queen.  And

9  Mr. Fry is the prospective purchaser.

10      MS. QUEEN:  That is correct, Your Honor.

11      THE COURT:  All right.  Thank you.

12      All right.  Is there anyone on the phone for the

13  Melanie Smith matter?

14      (No response)

15      THE COURT:  All right.  So, Mr. Livesey, I think you

16  brought everyone here today so why don't we start with you.

17      MR. LIVESEY:  Thank you, Your Honor.  There's a lot

18  going on.  The -- obviously the trustee has filed a motion to

19  both sell the property or in the alternative to abandon it, if

20  the Court would approve the sale.

21      The moving deadline here is tomorrow morning's

22  foreclosure sale, set by Mr. Olsen's client.  And so --

23      THE COURT:  So you're responsible.  No.  No, the

24  Court granted a relief from the stay, correct, some time ago?

25      MR. PETTEYS:  Yes, Your Honor.

1          THE COURT:  All right.  I'm sorry, please proceed.

2          MR. LIVESEY:  No, that's okay, Your Honor.  Really

3   part of what I have to say is that in a little bit on the

4   various pleadings by the debtor that I don't believe it's a

5   viable motion, but it could also be treated as an opposition to

6   the trustee's motion and I think what I have to say may have

7   some -- may be altered somewhat by what the Court's decisions

8   is on those -- on the debtor's pleadings.

9          THE COURT:  Well, I'm going to -- I don't -- Mr.

10  Budigan has tried to note stuff for hearing today.  I'm not

11  going to consider anything as a hearing, but I'll consider

12  anything he's filed as an opposition.  I did set this motion

13  here for a hearing on shortened time, right --

14         MR. LIVESEY:  Yes, yes.

15         THE COURT:  -- and I generally will take anything up

16  to the last minute as an opposition.  So I will hear from Mr.

17  Budigan on the motion itself.  I will say, Mr. Budigan, I did

18  not get a chance to review what you filed last night, but you

19  can tell me what's in there and then we can go from there.

20         So do you want to hear from Mr. Budigan before you

21  proceed?

22         MR. BUDIGAN:  Any context to what we're --

23         THE COURT:  Perhaps that -- yeah, I'm trying to

24  organize this -- all right.  Why don't we do this, why don't I

25  just go around the room and then I'll come back to you, Mr.

1 | Livesey, okay?

2 |          MR. LIVESEY:  That would be great, thank you, Your

3 | Honor.

4 |          THE COURT:  All right.  I see Mr. Olsen's grabbed the

5 | mic and remind me again you're here on behalf of which lender?

6 |          MR. OLSEN:  Selene Finance is the servicer, but it's

7 | the trust, the U.S. Bank Trust is the --

8 |          THE COURT:  And that's the first lienholder.

9 |          MR. OLSEN:  Correct.  And so I just wanted to give

10 | some context because it's my sale that's tomorrow that's kind

11 | of causing the emergency situation --

12 |          THE COURT:  Yes.

13 |          MR. OLSEN:  -- to let the Court know.  I woke up

14 | yesterday in Oklahoma to a series of motions filed.  I didn't

15 | respond to them for different reasons, but let me give you the

16 | context.

17 |          The senior lienholder was granted relief from stay in

18 | 2024, started the foreclosure process.  There was a sale set in

19 | February of 2025.  That sale was continued to tomorrow's date,

20 | in part because the trustee was looking at potentially selling

21 | the property for the benefit of the estate and paying my client

22 | in full.

23 |          My client is in a good equity position, in that

24 | they're owed just under about 400,000 and we think the property

25 | is worth I guess 1.2 million I believe is the current listing

1  or the current offering that the trustee has.

2         There is a junior lead behind us, however, that's

3  significant.  And so whether or not there's actually any equity

4  in the property probably depends as much on that, but my client

5  is in a decently secured position.

6         However, what has happened in the last couple of

7  weeks is this -- the motions to vacate the order of stay and

8  this idea of getting back into a 13 or trying to seek loan

9  modification, from my client's perspective that's not a

10 realistic opportunity because with the default, even if you

11 were to take the small amount that is suggested as being barred

12 by the statute of limitations, which my client in no way agrees

13 to, even if that were reduced, there still would not be a

14 likely result of the modification, because a modification of

15 the loan at this point in time would require capitalization of

16 significant arrears, a reset to the market interest rate, and a

17 monthly payment that doesn't appear feasible.

18        THE COURT:  I'm sorry to interrupt you.  Some -- the

19 microphones are really sensitive to any phones that are near

20 the microphone, so yeah, yeah, if you could put your phone

21 away.  Thank you.  I'm sorry, Mr. Olsen.

22        MR. OLSEN:  I apologize if that was my phone that was

23 doing that.  So I know I'm going off from the motion, but I

24 just want to give the full context here.

25        So our position has been, we would stipulate to

1 continue tomorrow's sale if it means closing, potential for

2 closing the trustee sale.  We're less interested in postponing

3 for some twelfth hour modification or eleventh hour

4 modification effort or if it's so we can litigate whether or

5 not $18,000 of fees is barred by the statute of limitations.

6 We don't see a good reason to postpone for that argument.

7          So, you know, we will stipulate to entry of an order

8 on the trustee's motion to sell, but I think with that, there's

9 things required of the debtor and my understanding the debtor

10 doesn't want to stipulate, the debtor wants to try to keep the

11 property, which I just don't see being realistic at this point,

12 based on what the facts are before us.

13          So that's our position on the trustee's motions.

14 We're willing to stipulate and continue the sale, but if the

15 truste is not going to be able to close the sale, then we would

16 want that denied and properly managed and just complete our

17 foreclosure tomorrow.

18          THE COURT:  Understood, I get it.  And let me make

19 sure I understand factually what the parties are arguing.  Your

20 client is U.S. Bank and first.  I've not seen anyone argue or

21 strike that.  I've not seen that the trustee argued that your

22 client's loan amount, may be barred in part by the statute of

23 limitations.  Is that right, Mr. Livesey?  I thought it was

24 primarily at the second position.

25          MR. LIVESEY:  That's correct, Your Honor.  I was not

1  aware on the position or on the issue of the statute of

2  limitations.  You know, this has kind of come up somewhat

3  sudden, particularly with regard to U.S. Bank.  And I haven't

4  had a chance to really parse through the debtor's response to

5  come to my own conclusions as to whether how much merit I think

6  there is to that claim.  But the debtor has raised.

7         THE COURT:  Right.  But --

8         MR. LIVESEY:  And so --

9         THE COURT:  I mean, the debtor was in bankruptcy from

10  2014 to 2020, so I'm kind of hard pressed to see -- I mean, and

11  then has been in this case for a while.  So have any statute of

12  limitations been tolled?

13         MR. LIVESEY:  Well, I -- I guess -- I'd like to be

14  diplomatic on that position, because I might find myself in a

15  scenario where I'm arguing the same argument the debtor is.

16         THE COURT:  No, I understand.  And you're finding the

17  case as it is, and you know, I understand.  You don't have to

18  agree with me, it's just kind of an observation that saying the

19  debt, you know, was due more than six years ago doesn't mean as

20  much when the party has been in bankruptcy for six years under

21  the bankruptcy protection of a Chapter 13.  We tried to make

22  this work, to be clear, and Ms. Smith has been before me many

23  times and she has been trying to make this work.

24         She was in a plan that unfortunately could not

25  complete due to income source, but that's a long way of saying,

1  you know, I am somewhat cautious about giving a whole lot of

2  credence to the statute of limitations arguments given that.

3          MR. LIVESEY:  Understand, Your Honor.  And based on

4  information that I have received from Mr. Olsen, I can move in

5  that same direction.

6          THE COURT:  You don't have to commit.  I'm not asking

7  you to commit anything.  Let me -- I said I was going to come

8  back to you, so let me honor what I said I was going to do.

9  Mr. Petteys, I'll turn to you next.

10          MR. PETTEYS:  Thank you, Your Honor.  I have to admit

11  I'm a little late to the party on this.  I didn't -- I wasn't

12  engaged until yesterday, so I apologize if I don't have answers

13  to some of Your Honor's questions.  But we are in second

14  position, that is Deutsche Bank and the proof of claim that was

15  filed was 655,000.

16          I didn't have an opportunity to get an update on what

17  the full amount due is, but I believe the loan's fully matured

18  and that's an approximation that's outstanding.

19          In terms of the allegation that any portion of that

20  liability is barred by the statute of limitation, I haven't had

21  a chance to evaluate the arguments that were asserted in the

22  motion that was filed yesterday afternoon or yesterday evening.

23          At this point, I mean, obviously our position is that

24  we reject that assertion.  And -- but having said that, we do

25  understand kind of the exigencies of the situation and, you

1  know, our concern is that if the property is abandoned it's

2  going to go to foreclosure and the proceeds are going to be

3  substantially less than that 1.28 million that it's currently -

4  -

5          THE COURT:  Right.

6          MR. PETTEYS:  And so, you know, we've --

7          THE COURT:  You're supporting the sale, hoping that

8  any arguments that reduces your client's claim fails because

9  that's better than having Mr. Olsen's client foreclose.

10          MR. PETTEYS:  Yes, Your Honor.

11          THE COURT:  All right.

12          MR. PETTEYS:  You've summed it up.

13          THE COURT:  All right.  Thank you.

14          MR. PETTEYS:  Thank you, Your Honor.

15          THE COURT:  It's what I get paid to do sometimes.

16          All right.  Thank you.  Let me turn to -- actually

17  let me come to Ms. Queen and I don't - these arearguments that

18  buyers don't have standing, but I generally want to hear from

19  folks as I'm trying to obtain facts.  So let me hear from you

20  before I go to Mr. Budigan, is there anything that you'd like

21  to say this morning?

22          MS. QUEEN:  Thank you, Your Honor, again Cambria

23  Queen representing the potential buyer, Mr. Steven Fry.  He has

24  submitted his offer to purchase to the trustee's office.  He

25  also recently I believe yesterday submitted additional offer

1  that included an escalation clause.  And we ask that the

2  Court authorize the sale.  My client is ready and willing to

3  purchase the property and has already obtained a title report

4  and everything on it.

5        We have no position with regard to any potential non-

6  allowable debts on it at this time.  We just ask that the Court

7  grant the motion to sell.

8        THE COURT:  Thank you, Ms. Queen.

9        MS. QUEEN:  Thank you.

10       THE COURT:  Do we have -- what's the closing date,

11  does anyone know off the top of the head of -- and I can pull

12  it up.  It's attached I think in Mr. Klein's declaration.

13        And if I were to approve this, this is for Mr.

14  Olsen's client's benefit to know, because I understand let me

15  just recap this, Mr. Olsen.  If the Court were to approve the

16  sale, your client would agree, your client would continue the

17  foreclosure sale for a reasonable period of time to allow it to

18  close.

19       MR. OLSEN:  It would, Your Honor.  I think the

20  missing piece is that I understand that the debtor has to

21  consent here as well because there is an issue with homestead

22  exemptions, so I would like to get that resolved if that's

23  going to happen.  Because the order of prudent sale is not

24  going to be enough to get it closed, if that makes sense.

25        And so I'd like to be able to --

1          THE COURT:  Why would -- I guess it's more for Mr.

2     Livesey.  Why would -- and again, I keep coming back to you,

3     but why would the debtor need to consent to the sale?

4          MR. LIVESEY:  Well, it is subject to a homestead and

5     she's not getting her full homestead amount.

6          THE COURT:  I understand but we sell properties all

7     the time without the debtor's consent.  If there's nothing to

8     pay the homestead, then there's nothing to pay the homestead

9     after payment of consensual liens.

10          MR. LIVESEY:  But this is not a short sale in that

11     sense because we -- you know, we negotiate with a secured

12     creditor who --

13          THE COURT:  Correct.

14          MR. LIVESEY:  -- can do whatever it wants with its

15     collateral, that's -- that doesn't really impact the homestead,

16     that just goes to the lender, you know, doing what --

17          THE COURT:  Right.

18          MR. LIVESEY:  -- with the collateral that it wants.

19          In a homestead situation, it's almost like a short

20     sale for the debtor.

21          THE COURT:  So the reason you need the creditor's

22     consent, it's governed by 363(f) and 363(f)(2) says you need

23     consent from any party and entity with an interest in the

24     property.  I've not heard it before to include the debtor.  Is

25     that your -- that's news to me.

1           MR. LIVESEY:  Well, I'll admit I've had this

2    conversation with others and not everybody agrees with me.  I

3    could quite possibly be misunderstanding, but I liken this to a

4    short sale.

5           THE COURT:  Right.

6           MR. LIVESEY:  And it's the debtor that's being

7    shortened.

8           THE COURT:  Right.  But under Jacobson and I have

9    followed Jacobson that I will sell a property subject or

10   authorized to sell the property subject to liens that exceeded,

11   because under state law you can do a foreclosure that wipes out

12   junior lienholders, so you can -- to the extent the homestead

13   holder has an interest it can be wiped out in a foreclosure

14   sale and will be wiped out tomorrow unless something happens.

15          And so therefore under Jacobson we can do a short

16   sale without somebody's consent, as long as you aren't paying

17   someone junior ahead of someone senior.  So I see Mr. Petteys

18   nodding his head.  So that's how I've always operated and so I

19   don't think that 363(f) is intended to include the debtor, who

20   might have an exemption claim, but even if it did it's just

21   junior to the consensual liens and therefore the Court can sell

22   free and clear of the debtor's homestead claim with or without

23   her consent.  So that's my ruling.

24          MR. LIVESEY:  Okay.  That's why, Your Honor --

25          THE COURT:  Yeah.

1       MR. LIVESEY:  -- I hadn't really applied <u>Jolin</u>

2   (phonetic) to --

3       THE COURT:  I'm sorry, I kept saying Jacobson, <u>Jolin</u>.

4       MR. LIVESEY:  Yeah.

5       THE COURT:  They're both Judge Brandt cases, I got --

6   so <u>Jolan</u> is the one that authorizes the sale under 363(f)(5)

7   because such entity could be compelled to accept the monies

8   satisfaction of such interest or under (f)(1) applicable non-

9   bankruptcy law permits the sale of such property free and clear

10  of such interest.  And you could either in a receivership

11  context or a non-judicial foreclosure context you can sell free

12  and clear of junior liens with or without their consent.

13      So don't need (f)(2) consent.  You need (f)(2)

14  consent if you're going to get a carve out and I guess I wasn't

15  sure by Mr. Olsen's filing if you were discussing a carve out

16  which would surprise me given you're going to get paid in full.

17  A carve out is not on the table with your client, is it?

18      MR. OLSEN:  No, Your Honor.  My -- it hasn't been

19  brought up yet, as of this morning yet.

20      THE COURT:  There are no carve out discussions with

21  either the first or the second.

22      MR. LIVESEY:  No, there is with the second.

23      THE COURT:  There is with the second.

24      MR. LIVESEY:  So far there hasn't been any with the -

25  - with Mr. Olsen's client, and again I guess on what you're

1  saying is about the homestead, yeah, I can't think of any

2  obvious reason why Jolan wouldn't apply to a homestead as well

3  as to any other secured creditor.  So thank you, Your Honor,

4  I've just properly schooled.

5      THE COURT:  Well, I'm not here to do that.  I don't

6  think 363 -- I've not heard 363(f) applied to the debtor in any

7  event.  And I guess the debtor has an interest, but it's a

8  homestead exemption claim.  I think that's not what 363(f) is

9  referring to.  I've not -- but I don't need to make a

10 definitive ruling, because again Jolan allows the Court to sell

11 it free and clear without the consent of junior lienholders.

12      All right.  Mr. Budigan, you've waited patiently.

13 Time is -- the floor is yours.

14      MR. BUDIGAN:  I'm handing a counsel an offer that

15 came in yesterday late in the afternoon.

16      THE COURT:  All right.  Well, I don't want it yet so

17 it's not in the records.  So don't hand it.  Okay.  Well, okay,

18 it's not in the record but you can talk about it.

19      MR. BUDIGAN:  It's --

20      THE COURT:  Maybe it is in the record.  Was it

21 attached to something you filed?

22      MR. BUDIGAN:  I've attached but it's the --

23      THE COURT:  Okay, whoa, whoa, I'm sorry.  Yeah, I

24 appreciate your standing.  You either need to sit and talk in

25 the mic or stand at the podium, especially with the mask on,

1    you need to talk loudly into the microphone.

2            MR. BUDIGAN:  It is in the response of debtor

3    yesterday that the Court has not read and the terms of the

4    offer are laid out there, but we didn't put the offer in

5    because we didn't want it in the public record of what the

6    actual purchase and sale agreement was.

7            THE COURT:  And why would you not want to have the

8    purchase and sale agreement in the record since people do that

9    pretty much every day?

10           MR. BUDIGAN:  I got it so late in the day I couldn't

11   really get permission from the buyer that they wouldn't want

12   their personal information --

13           THE COURT:  Their identity, okay.

14           MR. BUDIGAN:  -- e-mails, phone numbers.  This house

15   has got hundreds of people knocking on doors, on her door to

16   try to buy it and this -- and the record -- everyone's watching

17   what you're going to decide today about tomorrow's foreclosure

18   hearing.

19           THE COURT:  Right.

20           MR. BUDIGAN:  And you have the alternate purchase and

21   sale person represented by Ms. Queen.  And the big picture is

22   this, is that this offer is so much better.

23           THE COURT:  What's the number?

24           MR. BUDIGAN:  The number is 1,375 -- 1.375 million

25   and the other offer is 1.280 so it's $95,000 higher.  It's --

1 the difference between the two offers is the other one is, I

2 believe I've told from the multiple listing, that it's a full

3 cash offer, whereas this one has financing that's --

4            THE COURT:  When you say this one, what one are you

5 referring to?

6            MR. BUDIGAN:  The one from yesterday.  The one -- his

7 name is offered to buy by Timm, T-I-M-M.

8            THE COURT:  I'm sorry to interrupt you, but I'm

9 following along here.  So the offer -- here's -- the problem is

10 that by holding onto it until now Mr. Livesey and his client

11 have zero ability to evaluate whether it's real or not.  And so

12 I'm making a decision now.

13            MR. BUDIGAN:  I'm telling you, Your Honor.

14            THE COURT:  I know but --

15            MR. BUDIGAN:  I got it at like 4 o'clock or

16 something.

17            MS. SMITH:  No, it was more like 8 o'clock.

18            THE COURT:  Okay.  That's fine.  But I'm just saying

19 that handing it out now as opposed to two hours ago when Mr.

20 Livesey has been sitting there he could have been looking at

21 it.  Now --

22            MR. BUDIGAN:  I didn't know who he was in here and I

23 thought of just making an announcement.

24            THE COURT:  Whatever your excuse it, I can't evaluate

25 it.  It's not in the record.  No one knows if it's real, so you

1  can talk about it all you want, you won't even tell me who

2  the buyer is.

3      MR. BUDIGAN:  I did, Your Honor, the buyer is Timm,

4  T-I-M-M and that is in the record.  It's in what was filed

5  yesterday.

6      THE COURT:  Okay.  What was -- and what was filed

7  yesterday.  I haven't --

8      MR. BUDIGAN:  All the salient points, price, the

9  financing for it, it's in my pleading from yesterday.  And your

10 --

11     THE COURT:  But again, for future reference, you

12 telling me about a document even under a declaration violates

13 the best evidence rule.  If there's a document that has all

14 these terms, if you want to keep the buyer's name for the

15 moment under seal you could have just blacked it out with a pen

16 and filed it.  The idea that we're now just looking at a sale

17 at the last minute and I know you're trying, but you know, this

18 is the problem with the last minute.  We've got a foreclosure

19 sale set for tomorrow and I guess -- that's the challenge I

20 have, Mr. Budigan.

21     You want me to either deny or continue this hearing

22 on an offer that's not in the record and not before the Court

23 today.  That's the challenge I have.  I'll hear what you have

24 to say but that's the challenge.

25     MR. BUDIGAN:  Okay.  So I first want to address the

1  motion.  There's several mistakes in the motion and the

2  concept that this is anywhere near a short sale or that the

3  debts on the first and the second are higher than even the

4  1.280 offer is just not true.

5       What in the motion it talks about that at the moment

6  encumbrances exceed the sale price is what Mr. Livesey argued.

7  But then he concedes that well, this so called judgment of the

8  Federal National Mortgage Association that is alleged to be

9  322,000 that is kind of a third on this property that doesn't

10 exist.  That was a state case that is so short, it was a motion

11 -- it was a complaint to get a declaratory judgment to correct

12 the legal description.  Notice was sent out to everybody, the

13 debtor didn't object to it, because they were correcting it, it

14 was a technical thing and the judge signed the order.

15      Chicago Title gave me all the papers form it.  The

16 court case is in King County gave me all the papers from it.

17 It doesn't exist.  So what we're down to --

18      THE COURT:  What do you mean it doesn't -- there is

19 no judgment of record?

20      MR. BUDIGAN:  It's not a judgment.  It doesn't even

21 have a judgment from state court.  It is not a judgment, it is

22 a declaratory judgment --

23      THE COURT:  Okay.

24      MR. BUDIGAN:  -- that the legal description is

25 correct and it was not opposed and it's not money.

1          THE COURT:  Okay.  So that's -- you're saying

2     that's not an encumbrance.  Again, Mr. Livesey is just going

3     off -- and his client are just going off the title report which

4     we know the title report is not actually -- it's not the

5     correct name for it.  It's just someone has said this is what

6     is in the real property records, they're not evaluating whether

7     or not it's a real judgment or not.

8          So you're saying there's -- that's not on -- that's

9     not a valid debt.  Okay.  That's number one.

10          MR. BUDIGAN:  A declaratory judgment exists, but no

11     where is it about dollars.

12          THE COURT:  Okay.  So that's number one.  So what

13     else?

14          MR. BUDIGAN:  Okay.  So --

15          THE COURT:  And then you've got -- you believe

16     there's something --

17          MR. BUDIGAN:  Related to that, Your Honor.  So what

18     we have is a declaration from the attorneys for Selene

19     Financing that they're owed 370, 370,000 total for everything,

20     not just arrears.  And that's the number we generally agreed

21     with.  This whole concept of statute of limitations on some of

22     the money that's owed to Selene, it's only after $18,000 from

23     2012, '13, '14 for foreclosure costs that are so old.

24          And by the way, just as an aside really quick, when

25     she was in 13 for over six years she made all of the payments

1    to Selene under the 13.  It was only the last three that she

2    -- of $4,000 a month payments she could not make and then it

3    got converted out of it and it's a shame.  She should have been

4    allowed to finish, but that's water under the bridge.

5            But what it means is, is that the statute of

6    limitations they're only owed from December 1 of 2018, so

7    they're only owed the last six years, that's not barred by the

8    statute of limitations.  We're not saying that.

9            However, the statute of limitations is with Deutsche

10   Bank.  That's a loan from like 2009 that she never made

11   payments on it, other than the first two back in 2009 and

12   that's a real issue.  And I know Your Honor didn't like that.

13           THE COURT:  Well, no --

14           MR. BUDIGAN:  Didn't like the analysis.

15           THE COURT:  No, no, I didn't say -- I just -- all I

16   said, to be clear, the motion said the debt was more than six

17   years before this case was filed.  And I said the debtor was in

18   bankruptcy for five years, six years before this case was

19   filed.  So you may still have a legitimate argument.

20           I will note though, Deutsche Bank has filed a proof

21   of claim -- whoever is on the phone, could you please mute your

22   phone?  Thank you.

23           Deutsche Bank has filed a proof of claim and there's

24   no objection to it and it's under penalty of perjury.  It's

25   deemed allowed under the Bankruptcy Code.  So as we sit here

1  today, you can say you've got defenses, but the fact is there

2  hasn't been an objection to the claim.  So it is for purposes

3  of today's hearing, it is deemed allowed.

4          MR. BUDIGAN:  Your Honor, it has been objected to it

5  --

6          THE COURT:  It is not.  There's no -- I'm sorry, I'm

7  just going to cut you off.  There's been no objection to claim

8  noted for hearing, okay.  You filed a number of things a week

9  ago asking for an objection to claim hearing on seven days

10 notice, future reference, that will never be allowed, it's 30

11 days minimum.  The claim has been known for a long, long time,

12 so that's one reason I denied the motion to shorten time,

13 because all of these arguments could have been brought sooner.

14         The only arguments that are new are objection to the

15 sale.  But anything objecting to Deutsche's claim, all of that

16 could have been brought a long, long time ago.  And I know

17 you're recently engaged, so you're doing your best and the

18 Court appreciates that.  But ultimately, you know, your client

19 has been in this bankruptcy for a long time.

20         If there was an objection to the proof of claim that

21 could have been brought a long time ago is what I'm saying.  So

22 --

23         MR. BUDIGAN:  Your Honor, may I address that very

24 briefly?

25         THE COURT:  Sure.  The proof of claim was only filed

1  in June of '24.  It's recent.  It's not --

2          THE COURT:  June of '24, it's April of '25, that's

3  ten months.

4          MR. BUDIGAN:  But remember that her former attorney

5  had been terminated in the summer.  And that she brought

6  another attorney in for a little bit, but she's been pro se.

7  And the bottom line is, Your Honor, you turned down our

8  shortened time to the 3rd, which was last Thursday so it

9  wouldn't be the day before.  You denied that motion of

10 shortened time and I understand the Court's ruling that she

11 should have done all this months ago.  But this is still

12 relatively short in time and we did detail, very detailed

13 explain why the statute of limitations really impact Deutsche

14 Bank.

15         You're going to decide that today.  I understand

16 that.

17         THE COURT:  Correct, correct.

18         MR. BUDIGAN:  That's not going to be decided today.

19 That's -- and so here's what we're pitching.  We ask that there

20 -- first of all, we've got to have that foreclosure sale go

21 away.

22         THE COURT:  Well, that's -- okay.

23         MR. BUDIGAN:  We need that --

24         THE COURT:  How do I do that?

25         MR. BUDIGAN:  You do that by making an order.  That

1  says that it not be and continue it for 60 days.

2          THE COURT:  Okay.  I'd be curious as to what is the

3  legal authority I have to do that.

4          MR. BUDIGAN:  The legal authority is that Selene

5  Finance, has said, depending on your ruling today that they

6  would give 60 days, but they have to hear from you that you

7  want more time to resolve all of these types of things.

8          THE COURT:  Okay.  I'm hearing something different

9  from Mr. Olsen but he can clarify.

10          MR. BUDIGAN:  Well, I --

11          THE COURT:  He doesn't agree with what you're saying.

12          MR. BUDIGAN:  Yeah, but that's from the trustee, not

13  the bankruptcy trustee, but the deed of trust trustee, Robert

14  McDonald.  And he's saying, look, I see that you've gone to

15  Selene and you've asked for -- to reopen the modification from

16  last summer and just do a new modification and I see that you

17  asked for a continuance of the foreclosure date.  And we've all

18  discussed this down at Selene and what not, but there's a

19  hearing with the Judge on Thursday and that's today, and

20  they're saying if the Judge says, we need time to do all this,

21  then we move the hearing 60 days and then that allows us three

22  in the room to work on this.

23          Now -- so that's -- so everybody thinks you have the

24  authority to do it.

25          THE COURT:  I'm not sure everyone would agree.  I'll

1  tell you why.  I lifted the stay.  So now it's a state court

2  matter.  If you want to enjoin a sale, basically you need to

3  get an injunction from some court, either come to this court,

4  which required you filing an adversary proceeding and having a

5  hearing between now and 9 a.m. tomorrow.

6        MR. BUDIGAN:  Right.  So I thought that and I say to

7  myself, well then why doesn't the U.S. Bankruptcy Trustee bring

8  a motion to approve a sale, which would have to change the

9  foreclosure the next morning, and why would he bring it the day

10 before.

11       So he thinks coming back here that you have some

12 authority and they're supposed to make a decision here to

13 approve a sale at 1.28 and that if you don't, then it -- then

14 he -- he wants the property abandoned, because he thinks he has

15 it.  He says that it's not abandoned yet.  I will abandon and

16 I've asked the Court to abandon it if the Court will not come

17 up with other solutions here.  I want it abandoned and then

18 foreclosure can happen and then, yes, we run to state court.

19       But somebody thinks -- everybody -- I'm here because

20 people think that you have some authority to do something about

21 the sale here because why, because you have creditors involved.

22 You've got a first and a second that are trying to determine

23 wow, do we take a 1.2 or a 1.375, do we take that and get paid

24 in full, there is no short sale here, in full or do we let it

25 go the next day because we can't do anything about it because

1   it's been -- the stay is lifted, it's been abandoned already

2   and you just -- whatever we can get out of a measly foreclosure

3   sale, which gives them worse.

4           They should be -- everybody here should be moving the

5   foreclosure sale because the deals are so much better than what

6   anyone is going to get out of a foreclosure.

7           THE COURT:  Well, I mean, the sale that's currently

8   before the Court is enough to pay the first and second in full.

9   So I don't think that they really -- I can only imagine Mr.

10  Petteys' client doesn't care whether it's 1.2 or 1.3.  If his

11  claim is allowed as filed, they get paid in full.

12          MR. BUDIGAN:  But everyone here is aware there's a

13  foreclosure tomorrow morning.

14          THE COURT:  Right, well --

15          MR. BUDIGAN:  If there's a foreclosure tomorrow

16  morning you can't stop it and don't have any authority, then

17  the only people who can stop it are these gentlemen over here

18  who can talk to the lender and --

19          THE COURT:  Make sure you talk to --

20          MR. BUDIGAN:  -- say let's continue the foreclosure

21  sale.

22          THE COURT:  Just make sure you're talking into the

23  microphone.  I think we've beat this issue to death.  I've said

24  if you want to stay the foreclosure sale you're going to need

25  to get an injunction from some court, whether it's a state

1  court or this court or some other court, but I don't have the

2  power to just say I'm going to stop the foreclosure sale

3  because there's a thing called due process and a person would

4  need an opportunity to be heard on the subject, so I'm not just

5  going to order today the sale as continued.

6          So to the extent your -- what you're asking the Court

7  to do today, relies on me stopping the foreclosure sale,

8  unilaterally, bankruptcy over all, it's not happening.  I'm

9  sorry.

10          MR. BUDIGAN:  But what they're asking you to is

11  actually accept an offer today.

12          THE COURT:  I'm sorry?

13          MR. BUDIGAN:  Yeah, but they're asking you to accept

14  one of these two offers today.

15          THE COURT:  Yes.  Well, saying is if there's a

16  prospect of being paid, and you've heard me all morning saying

17  lenders want money, not property then I understand Mr. Olsen

18  saying they're willing to continue the sale if there's a real

19  prospect of a sale.  The only one before me is the one that Ms.

20  Queen's client has presented.  So that's the sale that is

21  before me today that I could approve.

22          Mr. Livesey's client would always like to get more

23  money, but given that there's not enough time probably to vet

24  this sale, we're probably looking only at the one offered by

25  Ms. Queen's client.

1        So your client, by the way, has got a homestead, to

2   take anything else after these first two or three liens, your

3   client is claiming a homestead and I don't think there's any

4   challenge to that.

5        So at this point there's nothing in it for the estate

6   unless Mr. Livesey creates some magic.

7        MR. BUDIGAN:  There is things in it for the estate

8   because the Deutsche Bank loan is way too high by hundreds of

9   thousands of dollars because of the statute of limitations

10  issue.

11       I suggest that we do this.  That you continue this

12  hearing for the parties to consider this offer versus the other

13  offer, because I know what the answer is going to be from the

14  U.S. -- the bankruptcy trustee.

15       THE COURT:  Right.

16       MR. BUDIGAN:  He's going to say 100,000 -- $95,000

17  more I'm going to take it.

18       THE COURT:  Sure.

19       MR. BUDIGAN:  I think that's what they'll do this

20  afternoon when we walk out of here and talk about it, she's got

21  proof of -- she's got preliminary proof of -- she's got

22  preliminary approval for the loan and and at the tax to it.

23       THE COURT:  Okay.

24       MR. BUDIGAN:  I think -- but I strongly object to the

25  motion to approve the 1.280 purchase because that's what's on

1  the table here and I understand that the Court won't take a

2  break after, between the two cases and look at the offer and we

3  can't get the Court to make a decision on this 1.375.  I

4  understand the Court's reasoning there.

5        THE COURT:  Well --

6        MR. BUDIGAN:  But that's not helpful to the parties.

7        THE COURT:  Well, it's -- the challenge here is the

8  Court lifted the stay.  And parties have a right to rely on the

9  orders of the Court.  And I forget, is it U.S. Bank?  Wait.

10 U.S. Bank has acted in reliance on that order and has set a

11 foreclosure sale, has actually continued it, but it is for

12 tomorrow.

13       And I'll say it the last time, I cannot and I will

14 not just issue an order without someone making a motion serving

15 it on U.S. Bank, giving them an opportunity to avoid the

16 imposition of an injunction, which is what you're asking the

17 Court to do is impose an injunction on them.

18       I can continue the hearing, but if I don't continue

19 the sale, the foreclosure sale, what good is the sale motion

20 hearing being continued?  None.  And so --

21       MR. BUDIGAN:  Because -- Your Honor, because --

22       THE COURT:  -- that's the problem.

23       MR. BUDIGAN:  -- if you continue the hearing, then

24 we'll have a chance and opportunity to brief all of this, my

25 motions that I filed long ago about the statute of limitations

1   will see forward.  You'll see the Washington State Supreme

2   Court case that says that --

3           THE COURT:  In 23 hours.  The sale is at 10 o'clock

4   tomorrow.

5           MR. BUDIGAN:  No, I'm going to go down and stop that.

6           THE COURT:  How?

7           MR. BUDIGAN:  I'm good.

8           THE COURT:  You may be good, but you know, you need

9   to tell me how before I --

10          MR. BUDIGAN:  I'm going to walk into the State Ex

11  Parte Department and get an injunction.  I'm going to file a --

12          THE COURT:  No, you're not.

13          MR. BUDIGAN:  -- lawsuit.

14          THE COURT:  That's not how injunctions work, sir.

15          MR. BUDIGAN:  I've gotten them before and I've even

16  stopped foreclosure sales, you know, minutes before they

17  actually happen.  That's up to me.  I would much rather get

18  agreement from the people in this room to get $95,000 more but,

19  Your Honor, that's not even where we're going.

20          THE COURT:  Okay.  I think that's a fly on the tail

21  because whether it's 1.2 or 1.3, you're facing a foreclosure.

22  If you can stop the foreclosure, man, you are pretty good.  I'm

23  kind of almost want to see that.

24          But here's -- let me -- thank you, Mr. Budigan.  Let

25  me turn to Mr. Livesey because --

1            MR. BUDIGAN:  There was another big picture item,

2   Your Honor.

3            THE COURT:  Oh, okay, okay.

4            MR. BUDIGAN:  The big, big picture item is that we

5   are working with Elaine  because we're only -- when it comes

6   down to it, we have $60,000 from the Washington State Housing

7   Commission, the half program --

8            THE COURT:  You meant Selene.

9            MR. BUDIGAN:  Selene.

10            THE COURT:  Okay.  Selene is the servicer for U.S.

11  Bank.

12            MR. BUDIGAN:  Yes, yes.

13            THE COURT:  All right.

14            MR. BUDIGAN:  And we have a $60,000 grant because of

15  COVID and all of these other things that --

16            THE COURT:  Right, I remember.

17            MR. BUDIGAN:  We have that.  That is sitting here and

18  we have another 20, so we have 80,000 that they could have

19  today.

20            THE COURT:  Right.

21            MR. BUDIGAN:  And then what we -- what we're asking

22  to do is modify the remaining $100,000 because in their own

23  declaration they say that what's owed is -- the whole thing is

24  370 to the first.

25            THE COURT:  Right.

1    MR. BUDIGAN:  But the cure is 180, is right around

2  179, 180.  But we have 80, so there's about 100 balance and

3  we're -- we were in negotiation trying to get Selene to modify

4  for that 100,000.

5    Then we have to deal -- we do have to deal with the

6  second, but we don't have to deal with the second today because

7  they're not foreclosing.

8    THE COURT:  And if --

9    MR. OLSEN:  Can I address that point, Your Honor or

10  not?

11    THE COURT:  Let Mr. Budigan finish and then --

12    MR. OLSEN:  That's all right.

13    MR. BUDIGAN:  The big, big picture is for the debtor

14  here, for the creditors, for everybody here, we think that we

15  should be able to have that opportunity and use those funds

16  that are available now but are dwindling because they're taking

17  them away.  Those funds are ending, but what we -- but we've

18  been approved.  We've got letters and we're approved.  It's

19  just a matter of seeing if Selene will work with us on that.

20  And they've said, well, we'll see what the judge rules today

21  because they think the -- everybody kind of hopes that this

22  foreclosure goes away.

23    THE COURT:  Everybody but Mr. Olsen's client.  I

24  agree with you there.  Most everyone in the room would like to

25  have some more, at a minimum, some more time, but I -- that

1  ship sailed when I lifted the stay.  When did I lift the

2  stay?

3        MR. BUDIGAN:  August 23rd of '24.

4        THE COURT:  That's a long time ago.  And so -- and

5  again, I understand you're new the party, Mr. Budigan, and

6  you're doing your best and the Court appreciates that.  But at

7  the bottom, the fact that your client was unrepresented and not

8  taking action is not a reason to delay parties who have relied

9  in good faith on the Court's order.

10        Mr. Olsen wanted to say something and then I want to

11  come back to Mr. Livesey.  Mr. Olsen.

12        MR. OLSEN:  Thank you, Your Honor, just a few things.

13  First, the declaration that is referred to from my client was

14  filed in April of 2024.  I just wanted to make sure the Court

15  understands the amount has grown since that time --

16        THE COURT:  Right.

17        MR. OLSEN:  So it's due.  So I think it's closer to

18  393,000 is I believe the current pay off, so I just put that

19  out there for everybody's knowledge that amounts have increased

20  since last year.

21        Second, part of the confusion we've had is that or

22  are we trying to sell the property or is the borrower to keep

23  the property and modify the loan and we need to kind of fish or

24  cut bait on that.  And I can say with respect to the

25  modification at 8 o'clock this morning I had a conversation

1  with the loan servicer and any modification there's not going

2  to be $100,000 placed at the end of the loan.  The only kind of

3  modification that this borrower could apply for would be one

4  that would take that amount, recapitalize it, set a new monthly

5  payment of the higher amount, at a market interest rate, and

6  there's nothing I have that indicates the debtor has any

7  ability to perform on that.

8       So I don't think it's a realistic opportunity to get

9  there.  So I think we're looking at a sale from someone.  And

10  my client, we're not rushing to get to foreclosure, we just

11  don't want to postpone for more litigation and more contests

12  that just waste time and drives up costs and fees.

13       So, you know, what I've said and what the foreclosure

14  trustee, who happens to be associated with my firm, what

15  they've said is they'll follow the law and they will follow the

16  directions of the beneficiary and what Selene has said is we'll

17  follow the law.  And so that's why we're here this morning.

18       And if there were -- if the Court were somehow to sua

19  sponte vacate the order terminating stay, we're not going to

20  violate that, but that doesn't mean that we think you should or

21  can do that under the Code.  It just means that we'll follow

22  the law.  And --

23       THE COURT:  Right.

24       MR. OLSEN:  -- so what -- you know, I have no issue

25  if the Court approves the trustee's motion to sell and the

1  trustee wants to take time to evaluate this other offer and

2  get the highest price, I think that's great for everybody.

3  What I don't want to have to do anymore is respond to pleadings

4  that aren't served on my client or served at the eleventh hour,

5  I don't even know what's pending out there right now.  We just

6  want to get this property sold.  If it can be sold at private

7  sale or be allowed to foreclose.

8            And so again, we'll move the sale.  I can -- I've got

9  to clear it with my client, I'll move the sale if it's to grant

10 and to facilitate the trustee's sale.

11           THE COURT:  Right.

12           MR. OLSEN:  I don't want to for the debtor's causes

13 if that makes sense.

14           THE COURT:  No, it does sense, thank you.

15           MR. BUDIGAN:  May I respond to that really quickly,

16 Your Honor?

17           THE COURT:  Sure, really quickly.

18           MR. BUDIGAN:  Because I've always provided them all

19 our motions.  We've had motions for over two weeks.  We did try

20 to shorten time, you wouldn't grant it, so here we are today.

21 And, no, the declaration from his client is Guinevere Jacobs

22 (phonetic) and it's March 26th and it says what's owing is 372.

23 We all agree on that.  We're not --

24           THE COURT:  Right.

25           MR. BUDIGAN:  That isn't really in dispute.  Big

1  picture here is, we're asking the Court from the debtor's

2  perspective and to get the biggest amount of money for the

3  creditors that you approve.  You won't approve this because you

4  haven't read it, but that you take it under advisement this

5  afternoon and make a ruling by 2 o'clock and just tell us

6  whether or not you approve this offer versus the other offer.

7  And tell all of us attorneys to file something with the Court

8  by 1 o'clock just saying what our position is and we should

9  pick a -- you should pick it.

10          THE COURT:  So your client is ready to sell the

11  property because that's what -- that's not what I've heard

12  throughout this case, is your client was not -- did not want to

13  sell the property.

14          MR. BUDIGAN:  My client doesn't want to sell the

15  property.

16          THE COURT:  Right, but I mean --

17          MR. BUDIGAN:  But my client doesn't want to lose it

18  to foreclosure tomorrow and she doesn't want to leave $95,000

19  on the table.

20          THE COURT:  Okay.

21          MR. BUDIGAN:  So what we're saying in this is, if the

22  Court --

23          THE COURT:  I understand.

24          MR. BUDIGAN:  -- approves this then we would like to

25  do is attempt to work with Selene and do a modification, get a

1  venue to the $80,000 and just to have the 100 and put that on

2  the end of the loan and we make our payments and move on in

3  life.  We will have to deal with the second.  And there will

4  have to be a hearing about the statute of limitations.

5          THE COURT:  Sure.  There will be a hearing on the

6  second.  Let me -- thank you, Mr. Budigan.  Let me come to Mr.

7  Livesey.  I want to ask you a question though because part of

8  the rationale for your sale, as I understand it, is that you

9  say if you can disallow a portion or allow of the Deutsche Bank

10  second position debt, secured debt that you can create value

11  for the estate.  And given that the debtor is asserting a

12  million dollar or whatever the maximum amount of the homestead

13  exemption, which is close to a million dollars, how are you

14  going to create value?

15          MR. LIVESEY:  We have already been in discussions

16  with Deutsche Bank over the statute of limitations issue and

17  also they have -- they are very conscious of the fact that they

18  don't necessarily want the property to go to foreclosure.

19          THE COURT:  Right.

20          MR. LIVESEY:  So that delta between is where the

21  value for the estate is going to have to lie.

22          THE COURT:  It would have to be a carve out.

23          MR. LIVESEY:  It would be -- I'm a little reluctant

24  to call it a carve out at this point, but yes, it would be a

25  carve out, it would be a settlement of the statute of

```
 1   limitations issue.

 2             THE COURT:  Right.

 3             MR. LIVESEY:  To be characterized in any number of

 4   ways.

 5             THE COURT:  Okay.

 6             MR. LIVESEY:  That is the value of the estate because

 7   -- yeah.

 8             THE COURT:  Because you're not avoiding any liens, so

 9   it's not a 550.  It would only be purely through a negotiated

10   settlement.

11             MR. LIVESEY:  Correct.

12             THE COURT:  Okay.

13             MR. LIVESEY:  And in large part because there is

14   going to be a fairly significant tax bite from this sale.

15             THE COURT:  Right.

16             MR. LIVESEY:  And we have again broad -- we know

17   what's committed, but we do have -- we talked some broad

18   numbers that should accomplish the -- to pay the IRS because if

19   the property goes to foreclosure and the sales price exceeds

20   her basis, she's going to have a capital gains --

21             THE COURT:  Right, that's why you want abandonment.

22   Either you want the Court to either approve --

23             MR. LIVESEY:  Yes.

24             THE COURT:  -- the sale or abandon the property

25   today.
```

1        MR. LIVESEY:  Correct.  And to Ms. Smith's benefit

2   that I do one or the other.  On a couple of points that were

3   raised by Mr. Budigan, the Fannie Mae judgment we knew when we

4   went in that it was probably not encumbered, but it showed up

5   on the title report.

6        THE COURT:  And that's all you reported and your sale

7   motion made it clear that you were reserving your right to

8   dispute that.

9        MR. LIVESEY:  Correct.

10       THE COURT:  I'm not worried about that.

11       MR. LIVESEY:  And the title company has since taken

12  it off the commitment.

13       THE COURT:  All right.

14       MR. LIVESEY:  But -- so I guess I'm not sure what --

15       THE COURT:  Well, let me ask you, let me ask you a

16  question, what if we were to continue this till -- I actually

17  have another matter at 1:30, so I still will be on the bench

18  this afternoon.  So Mr. Budigan would like you to review this

19  new sale motion, because here's where I'm coming from, which is

20  I'm only -- the only thing that helps everybody is the Court

21  approve the sale today.  If the Court doesn't approve a sale

22  today, the foreclosure sale is going to happen tomorrow.

23       MR. LIVESEY:  Correct.

24       THE COURT:  And so the question is if the Court is

25  going to approve the sale, which one.  And obviously the

1   trustee has a duty to get the highest and best value, but the

2   trustee at some point can say the door is closed and I'm not

3   sure if the door is closed or not.  But the question would be,

4   Mr. Olsen is only going to be able to say, yeah, I'll get my

5   client to continue the foreclosure sale, if there's some

6   confidence that whatever sale I approve is going to close in

7   some short time frame.

8          MR. LIVESEY:  I'm not sure how -- if that would be

9   necessary, Your Honor.  The updated offer from Mr. Fry includes

10  an escalation clause and --

11         THE COURT:  Okay.

12         MR. LIVESEY:  -- so he is willing to go beyond this

13  current offer on the sure dollar amount.  I'm a little

14  concerned also that this offer appears to have Ms. Smith as the

15  broker and also she hasn't got the authority to sell the

16  property anyway.

17         THE COURT:  Right.  No, it wouldn't be -- she

18  wouldn't be selling it, it would be -- it's essentially giving

19  it to your client as --

20         MR. LIVESEY:  Correct.

21         THE COURT:  -- an alternative offer and that's what

22  I'm saying, and I know this is coming in quickly but even a

23  couple of hours, future reference, find out who Mr. Livesey is,

24  and say, I've got this offer so we can at least be looking at

25  it for the last two hours and maybe talking to his client and

1  evaluating it.

2         MR. LIVESEY:  Your Honor, if I may, I did ask Mr.

3  Budigan for this offer.  He eluded to it in one of his

4  pleadings and I did ask early this week for him to prove me

5  with a copy.

6         MR. BUDIGAN:  No, no, that's not -- that's a

7  different one.

8         MR. LIVESEY:  He's saying it came in last night.

9         THE COURT:  But in any event, you know, we're all

10  moving at light speed here and that's the nature of this

11  practice sometimes.  I'm just saying that sometimes even a

12  couple of hours might be helpful and so I'm saying now is this

13  an offer that you think your client would like to review or do

14  you just want to stand on the current motion to approve the

15  sale.  That's -- I guess that's where we're at.

16         MR. LIVESEY:  Well, I think Mr. Frye is going to have

17  an opportunity to increase his offer, again with the escalation

18  clause.  I believe he is in the courtroom.

19         THE COURT:  Right.

20         MR. LIVESEY:  So, you know, we can get Ms. Queen to -

21  -

22         THE COURT:  Right.

23         MR. LIVESEY:  Ms. Queen, can we have a comment on

24  this?

25         THE COURT:  Oh, yeah, make sure you speak in the

1  microphone.  Ms. Queen has a comment.  Ms. Queen.

2          MS. QUEEN:  Yes, thank you.  Yes, there was an

3  escalation clause.  Again, my client's offer is a cash offer.

4  It's not contingent on financing.

5          THE COURT:  Uh-huh.

6          MS. QUEEN:  My client has authorized an increase in

7  the price of at least $55,000 above any higher offer to his

8  original up to a max of 1.8 million.

9          THE COURT:  All right.  Thank you, Ms. Queen.

10          MS. QUEEN:  And again, he is willing and able I

11  believe you had asked earlier, Your Honor, about closing.

12          THE COURT:  Yeah.

13          MS. QUEEN:  My client is willing and able to close

14  within 30 days or whatever the timeline that the trustee or the

15  banks or any title agency may require.

16          THE COURT:  So there's -- it's cash.  Are there any

17  other contingencies that have not yet been met or waived, if

18  you know off the top of -- Ms. Queen?

19          MS. QUEEN:  Your Honor, the inspection contingency

20  has been waived.  He is taking the property as is.  The only

21  thing that he hopes will be accomplished, which we may have to

22  do a motion in the future would be Ms. Smith vacating the

23  property after closing because the contract does provide for

24  possession at closing.

25          THE COURT:  Right, right.  The Court can -- the Court

1   has ways of enforcing those provisions and hopefully we don't

2   get there.

3           MR. BUDIGAN:  Your Honor, before we -- real quick.

4           THE COURT:  Yes, Mr. Budigan.

5           MR. BUDIGAN:  I'd asked for that for four times.

6   That would have been very helpful to know that there was an

7   escalation clause of $55,000 and the other offer I bring in.

8   That would have been helpful.  I ask that the Court order

9   somebody here to give me a copy of the buy purchase and sale.

10          THE COURT:  It's on the record at Docket No. 127.

11  The entire -- it's like 30 pages.  That's -- that escalator is

12  in there, Mr. Livesey?

13          MR. LIVESEY:  It's not on the one on the docket, Your

14  Honor, that was just signed yesterday.

15          THE COURT:  Ah, understood.

16          MR. BUDIGAN:  I haven't seen that.

17          THE COURT:  Okay.  So that's new.  But, I mean, at

18  this point I -- there's no reason to have an escalator because

19  I'm -- unless the trustee wants to try to negotiate a higher

20  price, I'm going to approve the sale that's before me today.

21  I'm going to enter an order so approving and for the following

22  reasons, the Chapter 7 trustee may sell property pursuant to

23  Section 363 of the Code if there are interests in the property

24  then you need to turn to Section 363(f).

25          363(f)(2) requires consent if the property is not --

1  the price to be sold is not sufficient to pay all creditors

2  with an interest in full, but with respect to the first

3  lienholder, it can be compelled under 363(f)(5) to accept

4  money.

5         And with respect to the second position lienholder,

6  there is a bona fide dispute as to its claim, so the Court may

7  approve it under 363(f)(4).  The trustee has satisfied my

8  question as to what value the trustee could generate for the

9  benefit of unsecured creditors with a sale, given the two

10  liens, even with the second one being disputed and the debtor's

11  maximum homestead claim which is over $900,000.  On its face

12  there does not appear to be anything that would be available

13  for unsecured creditors after paying the first and then the

14  homestead claim in full, but based upon representation of

15  counsel, there are negotiations with the second to create some

16  negotiated value.  Obviously that would need to be done on

17  notice to debtor and debtor's counsel.

18         There may be an objection to the claim filed by

19  debtor's counsel, that can be done as well.  And so at bottom,

20  there may be a prospect of the trustee generating some value

21  for the estate.  I don't know how high those prospects are,

22  because it would have to be negotiated, but allowing the sale

23  would at least preserve -- by approving the sale will at least

24  preserve the possibility of a substantial homestead claim

25  amount being paid to Ms. Smith.

1    Denying approval of the sale will result in the

2    loss of any homestead that could be achieved and then -- and

3    perhaps the payment of the second, to the extent it is allowed

4    in full or in part as filed.

5    And so this is the best result today.  Given the

6    current circumstances, might there be a better result, had we

7    had more time?  Perhaps.  But sometimes we don't have that

8    option.  In bankruptcy, we take the matters as we see it and I

9    appreciate Mr. Budigan's efforts at the last minute, while I

10   can't approve -- I can't authorize what he's requesting, the

11   Court, you know, understands and respects what you're trying to

12   do and that's trying to get the best deal you can for your

13   client under these circumstances.  I just don't have the

14   authority to wave a magic wand and stop the foreclosure sale

15   tomorrow.

16   I lifted the stay and the only way to stop it is for

17   the imposition of an injunction and an injunction requires a

18   filing of an adversary proceeding, followed by a motion for the

19   imposition of a temporary restraining order or preliminary

20   injunction, in accordance with Federal Rule of Civil Procedure

21   65 made applicable by Bankruptcy Rule 7065.

22   And so, you know, could I impose an injunction in the

23   next 22 hours?  It's possible.  I'm here, not out of town, but

24   that would be I guess moving heaven and earth would probably be

25   an understatement for Mr. Budigan to make that happen.  But as

1  I understand it, approving the sale, this one that Mr. Olsen

2  and his client have been able to review, I'm hopeful will lead

3  his client to continue the sale.  But I can't order it.  But

4  that's the hope and that's why the Court is approving the sale

5  to give parties some chance of getting something as opposed to

6  the first lender foreclosing and, within its right, getting

7  everything.

8          It's its right.  I granted that relief a long time

9  ago and we are here we're at.  The parties need to make the

10 best of the situation.

11         So, Mr. Livesey, you will want your order entered

12 ASAP, I assume.  So --

13         MR. LIVESEY:  Yes, Your Honor.

14         THE COURT:  -- when you upload it, call our chambers,

15 let us know so I can get my hot little signature on it.

16         I assumed you asked to waive the 14 day stay.

17         MR. LIVESEY:  I did.  I don't know if you can do that

18 under these circumstances.

19         THE COURT:  Well so let me -- I guess I know we're

20 running late, I apologize for those on the 11 o'clock calendar.

21 It is typically my practice to not waive the 14 day stay when

22 there's been an objection filed by a party and Mr. Budigan on

23 behalf of his client has filed an objection.  They were made in

24 good faith.  So I normally wouldn't waive the stay.

25         However, by not waiving the stay means if I'm Mr.

1  Olsen's client, I'm saying, if there's some possibility that

2  this gets stayed by an appeal, why would I continue my

3  foreclosure sale.  So I'm inclined to not -- I'm inclined to

4  waive the 14 day stay and make the order effective immediately

5  so the parties can proceed to try to close this.

6         But, Mr. Budigan, I guess that's up to you.  Well,

7  strike that.  You get to argue on -- it's up to me, but I'll

8  let you argue on that.  What -- do you -- are you insisting

9  that the 14 day stay that would make the sale order not

10 effective for 14 days should be -- should not be waived in this

11 case?

12        MR. BUDIGAN:  It shouldn't be waived because I have

13 to consider going higher.

14        THE COURT:  Yeah, well --

15        MR. BUDIGAN:  As well as going lateral.

16        THE COURT:  Yeah, yeah.  But Mr. Petteys just slapped

17 his forehead for a reason.  You're cutting off your nose

18 despite your face because the foreclosure sale's going to

19 happen tomorrow and your client's going to lose everything.

20 She's not going to get her homestead if the foreclosure happens

21 tomorrow.

22        The only way she's going to get her homestead claim,

23 any possibility, if I approve the sale and the party that's

24 foreclosing is comfortable enough that the sale will go

25 forward.  If you want the right to appeal it, foreclosure is

1  going to happen tomorrow.  Everybody loses except the first.

2  And the first would rather get paid.  So no one's -- no one

3  wants this result.

4        But you think you're going to -- you can stop the

5  sale tomorrow?  With an ex parte motion in state court?  Okay.

6  That's what you want to do, but I'm -- under the circumstances

7  I am going to waive the 14 day stay notwithstanding the

8  debtor's position because I think it's contrary to the debtor's

9  interest for the Court to -- it's not imposed the stay, it's

10  not -- I'm going to waive the stay because I find there is

11  cause, for the reasons I've been saying for the last 30

12  minutes.

13        So I will waive the 14 day stay.  Mr. Livesey, please

14  call me when your order is up.  You do not need to circulate it

15  around, because it's going to be a pretty straight forward

16  order and I don't want to get hung up with lawyers even --

17  you're all good lawyers, but I just want to get this order

18  entered and on the docket to give Mr. Olsen's client and the

19  foreclosure trust an order with which he can work with and then

20  make the decision.

21        You're free to try to stop the sale through other

22  means if you want.  But I'm not foreclosing you, no pun

23  intended, from trying to stop the sale, either through an

24  injunction or some other method.  But this is the Court's

25  ruling and I think is the best chance to get something for

1  people.

2  MR. BUDIGAN:  So, Your Honor, just for the record --

3  THE COURT:  Sure.

4  MR. BUDIGAN:  -- I don't understand why we're not

5  meeting at 1:30, giving each other a chance to look at this,

6  everyone to look at it and you're leaving $150,000 off the

7  table.  It's 95 more than this offer that I brought in

8  yesterday, that 95 more plus, the escalation of 55, you could

9  even give it to Fry and still make 150,000 more and --

10  THE COURT:  Sure.

11  MR. BUDIGAN:  -- we could decide that at 1:30.  We

12  could actually work this out.

13  THE COURT:  We're not going to do that.  Here's why.

14  It's the trustee's motion.  The trustee has brought this sale

15  before me.  I'm ruling on this sale.  I'm approving it.  I'm

16  sorry, that's the story.

17  I'd like to have $100,000 more.  As I said, I think

18  15 minutes ago, ideally everyone would like to see $100,000

19  more, but we're beyond the last minute.  The hearing is now and

20  bringing a sale, hammering it out during the hearing as opposed

21  to whenever the lawyers were here at 9:30, you may have had a

22  chance but now it's too late.

23  Now you can talk to the lawyers, you're going to go

24  out in the hallway, if you can convince the trustee that we can

25  get more, great.  I'm going to -- if -- the Court's never going

1  to object to more money coming in.  But at some point the

2  offer window closes and it appears to the Court that the offer

3  window has closed.  I'm not going to risk, I guess this is what

4  I'm not getting through to you.  I am not going to risk losing

5  everything for $95,000 more.

6         If the foreclosure goes through tomorrow, this is all

7  academic.  Your client gets nothing.  You understanding you're

8  fighting to save $95,000 but risking everything.  Okay.

9         MR. BUDIGAN:  It's $150,000 difference, Your Honor,

10 but I will talk to counsel.  I understand the Court's ruling.

11        THE COURT:  All right.  Thank you, Mr. Budigan.

12        Anything from anyone else?  Mr. Olsen?

13        MR. OLSEN:  A couple of housekeeping items, Your

14 Honor.

15        THE COURT:  Yes, please.

16        MR. OLSEN:  First off, just so that nobody wastes any

17 time or effort I will direct -- my client will postpone the

18 sale tomorrow.  So we're not -- because the Court is going to

19 enter an order approving the sale, I'll at least postpone the

20 sale so that we can have the opportunity to discuss with the

21 trustee what's going on.  I don't want to see any injunction

22 motions or something wasting money, time and money.  We can

23 certainly pause it and allow it --

24        THE COURT:  Thank you.

25        MR. OLSEN:  To be clear, the postponement will be to

1  pursue a sale of the property of the trustee, not for a

2  modification or anything else.  If somebody is going to sell

3  this property in the next couple of months and pay it off, the

4  modification isn't -- we're not -- if there's some sort of

5  motion on that, we'll be objecting.  I'm just making that for

6  everybody's benefit of what our point is in postponing.

7           THE COURT:  Thank you.

8           MR. OLSEN:  The sale can be postponed up until June I

9  believe, so we'll probably move the sale to either end of May

10  or beginning of June, because after that date, we would -- the

11  lender would --

12          THE COURT:  Start all over.

13          MR. OLSEN:  -- have to start all over and that's not

14  something that's on the table right now because we shouldn't

15  need to.  We should be able to get it closed before then.

16          THE COURT:  You'll talk with Mr. Livesey --

17          MR. OLSEN:  Yes.

18          THE COURT:  -- and be clear about the sale getting,

19  you know, the sale closed as soon as possible.  That's in

20  everyone's interest.  The Court appreciates you knowing that,

21  Mr. Budigan.  As much as I would like to have seen like you try

22  to stop this with an ex parte motion, it's not -- you don't

23  have to try now it seems like.  So that's good.

24          MR. OLSEN:  But I had a couple of other housekeeping.

25  Sorry.

1          THE COURT:  Yes, yes, no, no, go ahead.

2          MR. BUDIGAN:  I just wanted to for the record.

3          THE COURT:  Oh, yes, certainly thank you.

4          MR. OLSEN:  So there were motions filed yesterday and

5  before and -- about vacating the order terminating the stay and

6  about --

7          THE COURT:  None of those are before me.

8          MR. OLSEN:  Okay.  And there's nothing that needs to

9  be responded to then because they're not noted at this time.  I

10  just wanted to make clear that those are not something I need

11  to worry about right now.

12          THE COURT:  Not right now.  That -- if I'm going to

13  do anything like object to a claim, the rule says 30 days

14  notice.  I've never shortened time on an objection to proof of

15  claim.  A motion to vacate an order, I might, but since this

16  order was entered -- when did we say?  Last --

17          MR. LIVESEY:  The date was August 23 of '24.

18          THE COURT:  Yeah, so you know, I don't know.  I would

19  be hard pressed to shorten time to vacate an order, but in any

20  event, you know, if you want to make any motion to shorten time

21  I will rule on them, as I've already done.  I will rule on your

22  motion to shorten time.  I denied it.

23          I don't know what the basis would be to vacating the

24  relief from stay order or anything else, but if you want to

25  bring a motion before the Court, you may do so and I'll

1    consider it.  But right now there is nothing before the

2    Court, other than the trustee's motion to sell and in the

3    alternative abandon.  So that's all that's before the Court and

4    that's all the Court is deciding today.

5          MR. OLSEN:  All right.  And the last thing I want to

6    clarify is that there's been issued raised about statute of

7    limitations.  Now, to me those are owned by the trustee I think

8    at this point, and so I should be negotiating with the trustee

9    on any concerns that he may have regarding amounts of debt.

10         I don't know that -- I just want to clarify, I'm

11   trying to figure out who am I talking to on this.

12         THE COURT:  Well, I would say the debtor would have

13   standing --

14         MR. OLSEN:  Okay.

15         THE COURT:  -- to object to your claim because she

16   has a pecuniary interest in the homestead exemption --

17         MR. OLSEN:  Okay.

18         THE COURT:  -- and any reduction in claims would

19   inure to her benefit, at least arguably.  So I think the debtor

20   does have standing to object.  But in terms of how you run your

21   -- I mean, escrow is going to make -- you know, request a pay

22   off amount and you're going to make a pay off amount and the

23   trustee is going to either argue with you or not.

24         MR. OLSEN:  Well, my hope is that the parties

25   coordinate so we can do this in an organized fashion.  I'm

1  willing to answer any questions and respond to anything.  I'm

2  just getting things from different parties about different

3  theories is not going to help us close the sale timely.  So

4  that's just putting it out there for the world that I hope

5  people coordinate and come to us.

6          THE COURT:  Well, Mr. Budigan's here, he's I'm sure

7  can find you.  You're --

8          MR. OLSEN:  Yeah.

9          THE COURT:  -- on the paper, you're here every week.

10 So -- but the sale transaction is between the trustee and the

11 buyer.

12         MR. OLSEN:  Right.

13         THE COURT:  And any secured creditors.  I guess -- I

14 mean, I guess -- I mean Ms. Smith also has her own set of

15 claims, so I don't know, when you do a sale, I'm just curious,

16 does escrow reach out to an owner to ask for a pay off on a

17 homestead claim?  Typically not, right?

18         MR. LIVESEY:  No, they're to be treated as seller

19 proceeds.

20         THE COURT:  Right.  So -- but they come to the

21 trustee and the trustee will then get an order dispersing them.

22         MR. LIVESEY:  Right.  What I -- how I envision this

23 playing out -- well my vision's been changing by the minute,

24 but we, of course, would get the order approving the sale.  The

25 order will propose to pay U.S. Bank --

1          THE COURT:  In full.

2          MR. LIVESEY:  -- and then -- well, no --

3          THE COURT:  Oh, sorry.

4          MR. LIVESEY:  -- we have to hold back the $18,000

5  that the debtor claims is subject to the statute of

6  limitations.  We just simply haven't had a chance to look at

7  that.  I don't have a great deal of faith in that argument.

8          Similarly with Deutsche Bank, there's a $650,000

9  claim.  The trustee is proposing to pay them about $475,000

10  which again is the amount that I believe was in the debtor's

11  motion as being -- the big claim is the balance owed.  And

12  there's going to be about $175,000 left over, which would be

13  the subject of negotiation between the trustee and Deutsche

14  Bank.

15          THE COURT:  All right.

16          MR. OLSEN:  And, Your Honor, with my objection that I

17  filed, we haven't talked about the $18,000 hold out before.

18  And so one of the things that I'm wondering about is, since I'm

19  telling the Court we're not going to go to sale tomorrow, maybe

20  we don't need to upload the order today, maybe we take a couple

21  of days and see.  Because I don't have any authority to

22  stipulate to an order that says I'm not going to get paid

23  $18,000 if I don't have good cause.

24          THE COURT:  Right.

25          MR. OLSEN:  And so I'd like to just resolve that

1 issue before the order enters.

2        THE COURT:  All right.  So if you -- based on the

3 representation, Mr. Olsen, if your client is not going to go

4 forward in the -- as long as there is an understanding that an

5 order is going to be entered in the next 24, 48 hours, then why

6 don't we do that then.

7        MR. OLSEN:  It might take more than 24 or 48, it

8 might take a few days, I don't know how long it's going to

9 take, but it's not -- we're not going to go to sale while the

10 order is out there pending.

11        THE COURT:  Okay.  Perfect.

12        MR. OLSEN:  Just because I want to do it once and I

13 don't want to be back here again arguing about the same issue,

14 if I can avoid it.

15        THE COURT:  That would make two of us.  So let's do

16 that.  I mean the order as written is generally -- sometimes

17 the order will say we're going to make disbursements to the

18 first.  I thought the motion said that, but the order doesn't.

19 It does -- oh, it does say, the trustee may pay U.S. Bank from

20 proceeds at closing, which I will authorize.  It doesn't say

21 what the amount is and you want to be able to negotiate some

22 language in there -- yeah, some amount either agreed upon or

23 something like that.

24        MR. OLSEN:  Well, typically our language is in full

25 at closing whatever we're owed, and so we don't really put an

1    amount typically in the order, but since there's --

2              THE COURT:  Well -- yeah, and quite --

3              MR. LIVESEY:  With more information, the trustee

4    might simply agree to pay the full amount to U.S. Bank.

5              THE COURT:  Well, you can pay the full amount, but

6    that's still up for debate what that is.  The full amount could

7    still be -- the stated amount minus 18,000.  So the language in

8    the order probably as written, I guess you would want to say in

9    full, but that still doesn't resolve the question but maybe

10   that's good enough.  But I'll leave it up to the two of you to

11   work on the form of the order.  Yeah, so we'll go from there.

12   Okay?

13             All right.  So do we need to I guess deny abandonment

14   then or --

15             MR. LIVESEY:  I'll just withdraw it.

16             THE COURT:  Well, I mean, it was one motion, so it's

17   hard to withdraw.  So it is -- what I typically would put in

18   the order is the balance of the relief requested is denied

19   without prejudice.  So if you could add that at the end of your

20   order, or if you wanted to say, the abandonment motion is

21   denied as moot, something like that.

22             MR. LIVESEY:  Okay.

23             THE COURT:  I'll leave it up to you, Mr. Livesey, but

24   we -- I do need to address it since you did make the request.

25             All right.  Anything else?  I've heard from Mr.

1  Livesey, Mr. Olsen.  Anything else?

2          MR. OLSEN:  No, Your Honor, thank you.

3          THE COURT:  Thank you for all of those points.  Mr.

4  Petteys, anything else?

5          MR. PETTEYS:  Nothing from me, Your Honor, thank you.

6          THE COURT:  All right.  Thank you.  Mr. Budigan,

7  anything else?  I know this is not the result you wanted, but

8  for the reasons I stated -- make sure you speak in the

9  microphone.

10          MR. BUDIGAN:  Can we put a deadline date on the one

11  that will be negotiated, worked out, so we can get an order

12  because I can't do much without an order?

13          THE COURT:  Well --

14          MR. BUDIGAN:  I mean, I know what they're going to

15  do, they're going to pay them the $18,000 and I'm going to

16  object to that and bring a motion, but until the order is done

17  I can't do that.  So we're --

18          THE COURT:  Well --

19          MR. BUDIGAN:  -- all kidding ourselves if Selene is

20  going to give up the $18,000.

21          MR. OLSEN:  Well, Selene is going to follow the law,

22  let's be clear on that.

23          MR. BUDIGAN:  The law is all laid out in my motion.

24          THE COURT:  Yeah, I'd like for us to see the forest

25  for the trees, Mr. Budigan, I mean that's the flea on the tail

1  on the dog here.

2  MR. BUDIGAN:  I agree, I agree.  That's why it

3  shouldn't stall --

4  THE COURT:  Right, the sale.  Well, I mean, you're

5  going to object to the Court entering the order if there's a --

6  I'm trying to avoid objections.  If the parties have good faith

7  objections that's fine, but I'm honestly somewhat concerned

8  about involving you and drafting the order because of --

9  MR. BUDIGAN:  Don't --

10  THE COURT:  -- the things that you have filed in the

11  last 48 hours, I'm concerned that you're going to hold things

12  up so I'm not going to include you in drafting the order.

13  However, I don't want to prevent you from bringing an

14  argument.  And so how do we address this here?  You want to be

15  able to object the pay off amount basically is what you want to

16  do.  That's what you -- which is fine, I just don't typically

17  have debtors objecting to the pay off amount.  What I would --

18  what we can do is -- I mean, could we just pay everything but

19  the 18,000 and then have that held in reserve.

20  I mean, I'm kind of looking at Mr. Olsen and I know

21  you don't have authority to agree to this, but that's the easy

22  -- that's the way you resolve it.  If there is a legitimate

23  dispute as to the pay off amount, we keep and reserve that

24  amount here.  Mr. Olsen, thoughts?

25  MR. OLSEN:  Well, I'm concerned about this now.  But

1  the -- so my thought is if we're going to hold an amount in

2  reserve, which should be more than $18,000, it should be

3  $18,000 plus a potential amount for fees and costs of having to

4  defend against a motion that isn't supported by law.  And so --

5  or an objection that isn't supported by law.

6          THE COURT:  Well, in other words, Mr. Budigan, if you

7  object and you lose Mr. Olsen's fees are going to be added and

8  it may be the pay off amount may be $18,000 plus more.  So

9  again, I'm asking you to see the forest for the trees here.

10         MR. BUDIGAN:  It's not Selene's 18,000.  It's 200,000

11 --

12         THE COURT:  Of course it's --

13         MR. BUDIGAN:  -- for Deutsche Bank.  It's the same

14 argument, same statute of limitations and I'm trying to say I'm

15 not going to let it go on one to impact me in another.  I'm

16 just saying, all I ask, Your Honor, is to set a date that they

17 have to do the order by.

18         THE COURT:  Oh, we'll --

19         MR. BUDIGAN:  You've already told me not to be in it.

20 So this isn't hanging out.

21         THE COURT:  I'm not going to set a date.  I mean it's

22 going to be in the next few days, so I don't know why you need

23 to know a date.  You know it's coming, so to the extent you

24 want to present some sort of argument, you can start preparing

25 it today, whether the order's entered tomorrow or Monday or

1  Tuesday I don't know what that would matter.  The longer it

2  takes, the more time you get, to the extent that you want to

3  argue it.  But let me just again remind you that if you argue

4  and lose, the fees fighting over the $18,000 are going to be

5  added to the loan balance.

6          MR. BUDIGAN:  I object to that but if --

7          THE COURT:  Well, you're --

8          MR. BUDIGAN:  You give me a date too for arguing it,

9  that's -- I guess that is fair.

10          THE COURT:  You're going to lose that argument if --

11  you can object to the fees but if they're authorized by the

12  loan documents they're going to be put on the loan balance.

13          MR. BUDIGAN:  And, and Washington state law that if I

14  win that argument I get my fees for it.

15          THE COURT:  That is correct.

16          MR. BUDIGAN:  I understand.

17          THE COURT:  Okay.  So that's just a risk.  And so I'm

18  not going to impose a deadline for entering the order.  I'm

19  going to let Mr. Livesey and Mr. Olsen work on that.  I'm sure

20  it's going to be sooner rather than later because it's in

21  everyone's interest if we're going to get this sale done, let's

22  get it done quickly.  So I know they're not going to dilly

23  dally.

24          All right.  Anything else from anyone?

25          All right.  Thank you all for your time this morning.

1  I look forward to that order.  Again, call me, Mr. Livesey, I

2  guess they're the -- but still call me anyway.  Call my

3  chambers.

4          MR. LIVESEY:  Okay.  Thank you, Your Honor.

5          THE COURT:  All right.  Thank you all very much.

6  Have a nice weekend everyone.

7  (Proceedings concluded at 12:32 p.m.)

8                        *  *  *  *  *

9

10                      CERTIFICATION

11          I, **Mary E. Dring**, Court approved transcriber,

12  certify that the foregoing is a true and correct transcript

13  from the official electronic sound recording of the proceedings

14  in the above-entitled matter.

15

16  /s/ *Mary E. Dring*

17  _____

18

19  June 10, 2025

20

21

22

23

24

25